## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS ROBINSON & | : | CIVIL ACTION |
| LUIS RAMIREZ, | : | |
| Plaintiffs, | : | NO. 03-05180 |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| CORRECTIONS, et al., | : | |
| Defendants. | : | |

### MEMORANDUM AND ORDER

Stengel, J.                                                     January 23, 2007

This is a civil rights case concerning inmate mail handling procedures at the

Pennsylvania State Correctional Institution at Graterford.  The plaintiffs are inmates who

believe the institution's system for reviewing and distributing their legal mail violates

their constitutional rights.

The Third Circuit recently determined that prisoners have a First Amendment right

to have legal mail opened in their presence in Jones v. Brown, 461 F.3d 353 (3d Cir.

2006).  The Third Circuit held that a New Jersey Department of Corrections privileged

mail policy challenged in Jones "impinged" on this right.  The record in this case differs

from Jones in two significant respects.  First, the Pennsylvania policy is much more

narrow and allows for legal mail from attorneys and courts to be opened in the prisoner's

presence if the sender receives a "control number" from the Department of Corrections.

Case 2:03-cv-05180-LS Document 51 Filed 01/23/07 Page 2 of 32

Second, defendants support their policy with an extensive factual record, unlike the

supporters of the New Jersey policy who cited potential anthrax mailings as sole policy

rational. For these reasons and other discussed below, I find that the Pennsylvania policy

is constitutional and will grant defendants' motion for summary judgment and deny

plaintiffs' motion.

## I.    BACKGROUND

### A.    Procedural History

Plaintiffs Thomas Robinson and Luis Ramirez are incarcerated at the Pennsylvania

State Correctional Institution at Graterford. On September 15, 2003, plaintiffs filed suit

alleging that Policy DC-ADM 803,[1] promulgated by the Pennsylvania Department of

Corrections ("PA DOC"), violates their First Amendment right of free speech, First and

Fourteenth Amendment right to petition and access to the court, and Pennsylvania law.

This policy permits prison official to open prisoner's incoming legal mail outside of their

presence in certain circumstances, fully described below.

Plaintiffs filed a motion for summary judgment on March 17, 2004. Defendants

filled a cross-motion for summary judgment on June 28, 2004. On August 3, 2004, the

case was reassigned from Judge O'Neil to this court. On January 12, 2005, the court

ordered the case to be placed in civil suspense pending the outcome of the decision in a

---

[1] Copies of this policy are attached as an exhibit to the Deposition of Kimberly J. Ulisny, Graterford Mailroom Supervisor, which is attached to defendants' supplemental materials in support of their motion for summary judgment. (Document 46)

related case, which was also stayed pending a Third Circuit ruling.  On September 13,

2006, the court ordered the case to be removed from civil suspense.  The court gave the

parties until December 10, 2006 to file additional evidentiary materials in support of their

cross-motions for summary judgment.

### B.     Plaintiffs' Allegations of Improper Mail Handling

#### (1)     Plaintiff Robinson

Defendants deposed plaintiff Robinson on June 15, 2004.[2]  Robinson is serving a

life sentence following a November 1996 conviction and has been incarcerated at

Graterford since March of 1997.  Robinson Dep. pp. 4-5, 13.  His direct appeal and post-

conviction relief proceedings have closed.  Id. pp. 15-16.  A federal habeas corpus

petition is still pending in the Third Circuit and Robinson plans to appeal up to the United

States Supreme Court.  Id.

Robinson complains about incoming, not outgoing, mail.  Robinson Dep. pp. 9-

10.  First, Robinson complained that incoming legal mail from courts or district attorneys

is not opened in his presence.[3]  Id. pp. 8-9.  Robinson is a *pro se* litigant and does not

---

[2] Robinson's testimony pre-dates significant changes to DC-ADM 803, effective as of July 14, 2004, including requiring guards to hand-deliver court and legal mail to inmates and allowing courts to obtain control numbers.  See Robinson Dep. pp. 68-70.

[3] Robinson has a broad definition of privileged mail and compiled a log from September 2002 to August 2003 entitled "Dates on which Plaintiff's, Thomas E. Robinson, Properly Marked Incoming Legal/Court Mail Was Improperly and Erroneously Opened Outside of His Presence."  See Robinson Dep. Ex. 1.  Robinson testified that he considered a newsletter from an attorney describing new Supreme Court and Third Circuit decisions as privileged legal mail.  Id. pp. 38-39.  Robinson also included court forms for filing for bankruptcy or an appeal in this category, id. pp. 46-48, and copyright information from the Library of Congress.  Id. p. 53.

receive attorney-client privileged mail.  Id. p. 8.[4]  Robinson testified that he prefers legal

mail to be opened and inspected in his presence so he can "have confidence its not been

read or miscopied or it's copied by a vindictive guard and [distributed] through the jail,"

id. p. 56, although he has no evidence that these acts have ever occurred.  Id. p. 62.

Robinson alleged that Graterford mishandles his legal mail.  Sometimes his mail is

sent to other inmates' cells or sits in the mail room for five or more days.  Id. pp. 8-9, 12.

Graterford failed to deliver two court orders in a timely fashion.  Robinson did not receive

court orders dated April 30, 2003 and May 7, 2003 until June 3, 2003.  Id. pp. 49-51.  The

delayed delivery of these orders did not hinder the outcome of his litigation.  Id. p. 51.  In

fact, Robinson has never been adversely impacted by delayed mail.  Id. pp. 71-72.

Robinson urges Graterford to reestablish a logbook system or create a receipt

system so he can log when he actually receives legal mail.  Id. pp. 11-12.  Robinson

testified that he preferred Graterford's previous system of logging and distributing legal

mail because "under the old system...if I received legal mail say three months later than

what I should have gotten, there would have been a log system I signed [when] I actually

received it.  If any situation that I would have been procedurally time barred I can have

the record there saying this is when I actually received this document and forward it to the

court."  Id. p. 52.

---

[4] Robinson did not have an attorney representing him from the time the new DC-ADM 803 policy went into
effect until the time of the deposition.  Robinson Dep. p. 37.   At the time of his deposition, Robinson had spoken
with an attorney about representing him in the future.  Id. p. 18.

Robinson filed a formal grievance with the PA DOC.  On May 6, 2003, Chief Grievance Coordinator Thomas L. James denied Robinson's appeal stating that the PA DOC is appropriately following policies and procedures.

### (2)   Plaintiff Ramirez

Defendants deposed plaintiff Ramirez on June 15, 2004.[5]  Plaintiff Ramirez was convicted in December 1996 and has been serving a life sentence at Graterford since February of 1997.  Ramirez Dep. p. 4.  Ramirez has exhausted his direct appeal and state post-conviction relief and is pursuing a federal habeas corpus petition.  Id. pp. 10-11. Ramirez is not currently represented by an attorney.  Pls' Mot. Summ. J. ¶ 7.

Ramirez complained about Graterford's procedures handling incoming legal mail, which he defines as correspondence from government officials or agencies, courts or lawyers.  Ramirez Dep. pp. 6-7. Ramirez also includes materials from the census bureau, id. p. 17; a legal newsletter titled "Innocent Denial;" id. p. 34, and opinions, briefs, transcripts and correspondence from attorneys about his case.  Id. p. 33.  Ramirez kept a log of incoming legal mail entitled "Dates on Which Plaintiff's, Luis A. Ramirez, Properly Marked Incoming Legal/Court Mail Was Improperly and Erroneously Opened Outside Of His Presence."  Ramirez Dep. Ex. 1.  This list includes correspondence between Ramirez and an attorney who previously represented him named Gail Chiodo

---

[5] Ramirez's testimony pre-dates significant changes to DC-ADM 803, effective as of July 14, 2004, including requiring guards to hand-deliver court and legal mail to inmates and allowing courts to obtain control numbers.

and includes letters about transcripts, status of appeals, and copies of opinions.  Id.

Although Ramirez had informed Ms. Chiodo about the attorney control number policy,

she did not obtain and use a control number and her mail was not considered privileged.

Ramirez Dep. p. 23.  One attorney that Ramirez corresponded with, Ernie Preate, did use

a control number.  Id. p. 36.  Even though Mr. Preate sent Ramirez letters using the

control number, this mail was first opened outside of Ramirez's presence.  Id. pp. 23-24.

Ramirez did not file a grievance concerning this incident.  Id. p. 46.  Ramirez prefers

legal mail to be opened in his presence so he will know if his mail is being copied or

thrown away.  Id. p. 42.

Ramirez also complains about the way Graterford delivers the mail to him.  Id. p.

9.  Under the old policy, Graterford logged legal mail.  Ramirez could use this log to

prove that he did not receive mail because it listed what correspondence Ramirez had

received and from whom.  Id. p. 38.  None of the problems stated above have affected the

outcome of any of Ramirez's cases.  Id. p. 42.  Ramirez testified that he always received

his mail, even if it was initially delivered to the wrong cell.  Id. pp. 43-44.

Ramirez filed a formal grievance with the PA DOC.  On July 16, 2003, Acting

Chief Grievance Coordinator Sharon M. Burks denied Ramirez's appeal stating that the

PA DOC is appropriately following policies and procedures.

### B.     Defendants' Policies on Privileged Mail

Defendants are the Pennsylvania Department of Corrections ("PA DOC"), Dr.

Jeffrey A . Beard, Warden Donald T. Vaughn, Michael Spencer, and Kimberly Ulisny

(collectively "Defendants").  Plaintiffs' lawsuit centers on Policy Number DC-ADM 803

on Inmate Mail and Incoming Publications.  The PA DOC further revised this policy after

plaintiffs filed this lawsuit.  The new changes to the policy went into effect on July 15,

2004.  Ulisny Dep. Ex. D-2.

### (1)   Description of Policy Number DC-ADM 803 currently in effect

There are two categories of incoming privileged mail.  Ulisny Dep. Ex. D-2

Section VI. B. Privileged Correspondence.  In the first category, an attorney may hand

deliver sealed confidential client communications.  Id. at 2.a.  This "sealed privileged

mail" is then unsealed and searched prior to being delivered in sealed format to the

prisoner.  Id.  Plaintiffs' allegations do not focus on this aspect of the policy.

The other category of privileged mail is attorney control number mail that is only

to be opened in the presence of the inmate.  Id. at 2.b.  To send mail with this status, an

attorney must obtain a control number from the PA DOC.  Id.  In the application process,

the attorney affirms that he or she will use the control number for confidential attorney-

client communication and the correspondence will not include contraband.  Id.  A court

can also request a control number by making a similar verification.  Id.  If this procedure

is followed, mail should be opened in the presence of the inmate.  If this procedure is not

followed, mail from an attorney or a court is treated as regular mail and opened in the

mailroom before it is delivered to the inmate.

There is an additional procedure for court mail that calls for hand delivery directly to the prisoner.  According to the policy, "[m]ail that appears to be from a court, but bears no control number, shall be opened and inspected for contraband by the facility's mailroom staff....If no contraband is found, the contents shall be placed back into the envelope, which shall then be taped or stapled shut.  Staff shall then deliver this court mail to the inmate...ensuring that a staff member hands the mail directly to the inmate." Id. Section VI. B.3.

### (2)    Rational for implementing Policy Number DC-ADM 803

Defendants support their decision to change legal mail policies based on the testimony of Jeffrey Beard, Secretary of the PA DOC and the agency's key policy maker, Beard Dep. pp. 39-40, and two key PA DOC reports.

Mail is a vehicle to get contraband inside secure prison facilities and this practice seriously compromises Pennsylvania prisons.  Beard Dep. p. 9.  The PA DOC defines contraband as anything that is not issued to prisoners or purchased through the commissary, including money, postage stamps, weapons, implements of escape, and drugs.  Id. pp. 9-10.  The PA DOC developed specific concerns that legal mail was being used to smuggle contraband into the institution or abused to send items that were not privileged, such as birthday or Christmas cards.  Beard Dep. p. 18.

Because of these concerns with the mail, mail inspection personnel are specially trained and their sole job is to process mail.  Id. pp. 12-14.  Mail is sorted and processed

outside of the secure perimeter of the prisons as an additional safeguard to prevent contraband from entering the facility.  Id. pp. 13, 30-31.  It is problematic to ask corrections officers to act as mail inspectors on the cell block because they lack this specialized training.  Id. pp. 29-30.  Additionally, there are more distractions on the cell block than in the mailroom and therefore inspections outside of the mailroom are often less thorough.  Id

One incident played a key role in the changes to the PA DOC's privileged mail policy: Norman Johnson's 1999 prison escape from a restricted housing unit at the State Correctional Institute in Huntingdon, Pennsylvania.  Id. pp. 18-19.  The PA DOC investigated this event and prepared the "Escape Report" in November 1999.  This report found that "substantial evidence shows that Johnston was able to introduce contraband into the institution through legal mail."  Escape Report, Pennsylvania Department of Corrections, November 1999, p. 23.  The report also illuminated problems with searches of legal mail.  It concluded that corrections officers were not trained to conduct mail searches; did not have the proper tools to search; and were reluctant to conduct searches because they feared lawsuits.  Id. pp. 59-60.  The report noted that it was difficult to determine whether mail was actually sent by attorney since legal envelopes are easily stolen.  Id. p. 60.  The report concluded that the PA DOC's definition of privileged legal mail was too broad and recommended that it revise the policy to ensure proper searches of legal mail.  Id. pp. 60, 69.

Beard also cited the series of anthrax mailings as a concern and noted that PA

DOC institutions have received letters containing powder.  Beard Dep. p. 24.  Although

none of these mailings have contained anthrax, Beard testified that the PA DOC must

treat them as if they had anthrax.  Id. p. 25.  It is preferable to handle these letters in the

mailroom because the area can be secured more quickly than a cell block and is outside

the secure perimeter of the facility.  Id. pp. 25-26.  The mailroom also has a biohazard

mailbox, which can be used to open suspicious pieces of mail safely in a sealed box.

Ulisny Dep. pp. 41-42.  Mailroom employees have used the biohazard mailbox to open

mail.  Id.

The PA DOC compiled a special report on contraband and legal mail.  See Charles

McKeown Decl. and Pennsylvania Department of Corrections Privileged Correspondence

Inspection and Contraband, Sept. 20, 1999, ("Privileged Correspondence and Contraband

Report").  The report finds that "privileged correspondence has been used as a vehicle to

introduce contraband into our facilities for years....Inmates particularly like to use legal

mail when attempting to introduce contraband because of the restrictions placed on staff

processing this material."  Id. Privileged Correspondence and Contraband Report.

Moreover, x-ray equipment cannot detect contraband such as cash, road maps, forged

release papers, fraudulent identification materials, and other "implements of escape."  Id.

The report concludes that a "random sampling of incidents involving legal mail abuse"

from the past thirteen years shows this is an ongoing problem and is "extremely

compelling evidence to support inspection of legal mail outside the presence of the inmate as there is a substantial governmental interest of security and the orderly running of our facilities." Id.  Some of the incidents cited in the report include: used tube of hydrocortisone cream in legal mail (June 1993); personal correspondence sent to inmate under guise of legal mail (May 1995, July 1996); forged pardons forms (April 1997); drugs concealed in packages appearing to be legal mail from the Defender's Association of Philadelphia (November 1997); sending personal items as legal mail (March 1998); heroin found in binding of legal folder sent through legal mail (December 1998); marijuana in legal transcripts (September 1999).  Id.

Kimberly Ulisny, the present Mailroom Supervisor at Graterford, has worked in the mailroom for nearly thirty years.  She testified that she has personally observed contraband in the legal mail three to four times a year.  Ulisny Dep. pp. 61-62.  She remembered one specific incident where a mailroom employee discovered marijuana in a legal document while opening mail in an inmate's presence.  Id. pp. 129, 141.  These problems have stopped now that the PA DOC has implemented new policies.  Id. pp. 73-76.

As a result of these reports and upon evaluation of their procedures for handling privileged legal mail, Beard testified that "we sat down and said...we need to come up with some better way of getting the privileged mail in so that the inmate can still have that attorney client privilege, but so that we can reduce the threat to the institution of getting

this contraband in." Beard Dep. p. 20.  Beard asserted that the newly instituted policies were not speculative: legal mail had been used regularly in the past to smuggle in contraband and he expected this practice to continue.  Id. p. 59.

Michael Farnan, Chief Counsel to the Department of Corrections, negotiated with the American Civil Liberties Union ("ACLU"), Pennsylvania Institutional Law Project, and the Defender Association of Philadelphia, regarding the PA DOC's revisions to its privileged mail policies.  Second Dec'l Michael Farnan, Defs' App. Ex. C (Document 20).  The state Attorney General and Pennsylvania House and Senate Judiciary Committee reviewed the regulations before they became effective.  Id. Letter from Michael Farnan to Stefan Presser, Legal Director ACLU Foundation, June 6, 2002.

After researching and evaluating legal mail procedures, defendants revised privileged mail procedures in September 2002 and a version of these revisions are in place today.  Id. p. 23.  These procedures are described below.

### (3)   Mail delivery procedures at Graterford

### (a)   General mailroom procedures

Kimberly Ulisny, the present Mailroom Supervisor at Graterford, has worked in the institution's mailroom for nearly thirty years.  The mailroom at Graterford handle two to three thousand pieces of mail on an average day.  Ulisny Dep. p. 11.  This includes 35 to 40 pieces of court mail and 25 pieces of attorney control number mail each day.  Id. p.

26.  See also Id. at Ex. D-7, D-8.  Legal mail is not logged.[6]

The mailroom is located on the bottom floor of the New Administration Building. Ulisny Dep. p. 6.  Ulisny referred to this location as "outside the wall," a term indicating that the mailroom is separated from inmate housing and activity areas by a security gate and a wall.  Id. pp. 6-9; see also Ex. D-1.  The only prisoners who have access to the mailroom are the inmates who work as janitors.  Id. p. 8.  There are two to four inmate janitors who clean the room for 20 to 25 minutes each day.  Id

All incoming mail is x-rayed.  Id. at 12.  The x-ray machine does not detect everything inside the mail; its abilities are limited by the size of the item, the material it is made out of, the density of the material, and the packaging.  Decl. Ulisny.  In November 2004, the machine did not find packets of heroin that mailroom employees found upon manually inspecting two book bindings.  Id.

All incoming mail is also opened and inspected for contraband.  Employees open the mail and check through it to make sure that nothing is in between the pages of the letters.  Ulisny Dep. p. 28.  The mailroom staff is trained to examine the letters for contraband including stamps, blank writing paper, blank envelopes, money orders or cash,

---

[6] Ulisny estimated that it would take an extra 30-45 minutes each day to separately log incoming legal mail and track the date the inmate received it.  Ulisny Dep. p. 111.  Before September 2002, Graterford logged incoming privileged legal mail.  Id. p. 112.  When the prison logged legal mail in two separate logbooks, this took an additional 60-90 minutes.  Id. p. 144.  Logging mail is not currently required under Policy DC-ADM 803.  Beard testified that he believed the logbook requirement stopped because there was not a problem with losing legal mail.  Beard Dep. pp. 59-60. Beard asserted that there were no systemic problems with untimely delivery of legal mail because "...if it were something that was a real problem in a facility I would hear about it.  And I'm not aware of that being a real problem in any facility."  Id. p. 77.

drugs, and tattoo needless.  Id. p. 30.  Employees do not read mail, including legal mail.

Id. p. 34, Beard Dep. p. 15; DC-ADM 803 § VI.D.1.c ("Incoming and outgoing

correspondence, other than privileged correspondence, may [only] be read upon the

written order of the Regional Deputy Secretary..." in certain limited circumstances.).

### (b)  Legal mail procedures before October 2002

The PA DOC's procedures for handling court mail and attorney control number

mail have changed over time.  Before October 2002, the PA DOC classified all attorney

and court mail as privileged.  Ulisny Dep. pp. 21-22.  Mailroom employees determined

what fell into the legal mail category by looking at the return address on the envelope to

see if it had a court name, the name of a law office, or if the sender used the title of

"Esquire."[7]  Id. p. 23.  At this time, all privileged mail was exempted from the usual

inspection procedures and opened in the presence of inmates.  Beard Dep. p. 15.  In

October 2002, this changed and only letters with attorney control numbers were

considered privileged mail; all other letters from attorneys that did not have a control

number went into the regular mail pile.  Ulisny Dep. p. 23.

### (c)  Legal mail procedures after October 2002

After October 2002, the PA DOC limited the class of legal and court mail that was

opened in the inmates's presence.  Plaintiffs specifically challenge these changes.

---

[7] This policy is not secure because computer programs allow individuals to make up false letterheads and envelopes.  Beard Dep. p. 33.  For example, Beard noted that, on at least one occasion, a prison received forged court documents that changed an inmate's sentence.  Id.

(i)      **Attorney control number procedures after October 2002**

Mail with an attorney control number is sorted according to a special procedure and opened in the presence of the inmate.[8] A mail inspector checks the control number against a list to make sure the number is valid. Ulisny Dep. p. 49; see also id. Ex. D-3 for a list of attorney control numbers. Once validated, the control number is obliterated to ensure its confidentiality. Ulisny Dep. p. 49. The unopened mail is sorted by cell block. Id. There are two delivery procedures: one for general population and one for the rest of the inmate population. Id.

For inmates in general population, mail is delivered to a central location and opened and inspected by a mailroom employee in their presence. Graterford notifies inmates that they have mail and they pick it up. Ulisny Dep. pp. 51-52. A mailroom employee takes the mail through the security gate to deliver the items to the inmates "inside the wall." Mail is typically delivered in the afternoon from a "control bubble" in the maintenance corridor. Id. p. 51. The employee stands inside the control bubble and delivers mail to inmates via a window. Id. pp. 51-52; see also Ex. D-5. Inmates line up and wait for the mail with their identification cards. Ulisny Dep. p. 51. After checking the ID card, the employee opens the attorney mail in the inmate's presence, inspects the letter, puts it back in the envelope, and hands it to the inmate. Id.

For all other inmates, attorney control number mail is delivered in their cell block

---

[8] Mail from an attorney without a control number is opened in the mailroom, not in the inmate's presence.

and opened and inspected in their presence by corrections officers.  This includes inmates

who cannot come to the central location because they are restricted to their cell blocks

due to pre-hearing confinement or reside in special needs units; restricted housing units,

the infirmary or mental health units.  Murray Dep. pp. 28-29.  The attorney control

number mail for these inmates is placed in green bags positioned prominently on top of

the mail cart, along with the court mail.  Ulisny Dep. p. 66.  Officers in the cellblock take

the letter to the cell, open the letter, inspect it, and hand it directly to the inmate.  Murray

Dep. pp. 38-39.  All undeliverable mail (e.g. mail that is sent to the wrong cell block) is

returned to the mailroom for re-delivery.  Id. p. 40; Ulisny Dep. p. 66.

### (ii)      Court mail procedures after October 2002

Court mail is initially processed in the same way as regular mail.  It is opened,

inspected, and resealed in the mailroom facility.  Ulisny Dep. p. 33.  Between October

2002 and July 2004, court mail was treated as regular mail for delivery purposes.  In July

2004, the Department amended the policy to require mailroom employees to place court

mail in a separate pile for special handling.  Id. p. 24.  Now, after court mail is opened,

inspected and resealed, it is placed in a special envelope on the top of the mail cart to be

delivered to the cell block.  Id. pp. 33, 46.

John Murray, Deputy Superintendent for Facility Management, has been employed

with the PA DOC for twenty-five years and currently supervises the corrections staff.

Murray testified that court mail is delivered to the housing units in a special pouch.

Murray Dep. pp. 36-37.  Once in the unit, court mail is delivered to the unit managers, who send for the inmates.  Id. p. 37.  The inmates come to the unit manager's office and are physically handed their pieces of mail from the court mail pouch.  Id.  If the unit manager is unavailable, the zone lieutenant performs this task.  Id. p. 38.  Court mail is never delivered to unattended inmate cells.  Id.

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party initially bears the burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  A fact is "material" only when it could affect the result of the lawsuit under the applicable law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party."  Id.  The moving party must establish that there is no triable issue of fact as to all of the elements of any issue on which the moving party bears the burden of proof at trial.  See In re Bessman, 327 F.3d 229, 237-38 (3d Cir. 2003) (citations omitted).

After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); see also Williams v. West Chester, 891 F.2d 458, 464 (3d Cir. 1989). A motion for summary judgment looks beyond the pleadings and factual specificity is required of the party opposing the motion. Celotex, 477 U.S. at 322-23. The non-moving party may not merely restate allegations made in its pleadings or rely upon "self-serving conclusions, unsupported by specific facts in the record." Id. Rather, the non-moving party must support each essential element of its claim with specific evidence from the record. See id.

A district court analyzing a motion for summary judgment "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in favor of that party. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005) (citations omitted). The standards governing cross-motions for summary judgment are the same, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. Grove v. City of York, 342 F. Supp.2d 291, 299 (M.D. Pa. 2004). Summary judgment is therefore appropriate when the court determines that there is no genuine issue of material fact after viewing all reasonable inferences in favor of the non-moving party. See Celotex, 477 U.S. at 322.

III.    DISCUSSION

Imprisonment does not deprive inmates of constitutional protections, most notably the protection of the First Amendment "[b]ut at the same time the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere." Beard v. Banks, 126 S.Ct. 2572, 2577-78 (U.S. 2006).  This court must consider plaintiffs' constitutional claims in light of the PA DOC's rational for enacting Policy DC-ADM 803.

     (A)    **First Amendment Freedom of Speech Claim**

          (1)    **A practice of opening legal mail outside of the presence of the inmate infringes the First Amendment right to freedom of speech.**

In Jones v. Brown, 461 F.3d 353 (3d Cir. 2006), the Third Circuit clarified the standards to utilize when evaluating a prisoners' First Amendment freedom of speech claim.  The court examined a policy promulgated by the New Jersey Department of Corrections suspending the requirement that legal mail[9] be opened in the inmate's presence in response to the anthrax mailings in the fall of 2001.  Id.  In rendering its decision, the Third Circuit reaffirmed Bieregu v. Reno, 59 F.3d 1445 (3d Cir. 1995) which held that a pattern and practice of opening incoming legal mail outside of the

---

    [9] Although the Jones court did not define what classifies as legal mail, it reaffirmed Bieregu v. Reno, 59 F.3d 1445 (3d Cir. 1995) , which defined two categories of legal mail: (1) correspondence between an inmate and an attorney and (2) correspondence between an inmate and a judge, clerk's officer, or other courthouse address.  59 F.3d at 1449.  This definition is significantly narrower than the definition advocated by the plaintiffs.

inmate's presence infringes on his right to freedom of speech.  Id. at 359.  This practice

violates inmates' free speech rights because it "deprives the expression of confidentiality

and chills the inmates' protected expression, regardless of the state's good-faith

protestations that it does not, and will not, read the content of the communications."  Id.

Once a prisoner establishes an infringement on his First Amendment right through the

opening of legal mail outside of his presence, the prisoner need not "allege any

consequential injury stemming from that violation" because "protection of an inmate's

freedom to engage in protected communications is a constitutional end in itself." Id. at

360-61.[10]

Finding a "burden" on prisoners' First Amendment rights is not the end of the

analysis.  461 F.3d at 360.  A court must next analyze the policy under the test the

Supreme Court promulgated in Turner v. Safley, 482 U.S. 78 (1987) to determine

"whether a prison regulation is reasonably related to legitimate penological interest.

Beard, 126 S.Ct. at 2578 (citation omitted).  The Third Circuit instructs courts to conduct

a two-step Turner analysis:

> First, there must be a valid, rational connection between the prison regulation and
> the legitimate governmental interest put forward to justify it.  Thus, a regulation
> cannot be sustained where the logical connection between the regulation and the
> asserted goal is so remote as to render the policy arbitrary or irrational or to
> demonstrate that it represents an exaggerated response to the asserted objectives.
> [Second] If such a rational relationship is found to exist, that determination

---

[10] This aspect distinguishes First Amendment freedom of speech claims from First Amendment access to courts claims.  See infra Section III.B.

commences rather than concludes our inquiry.  The other three Turner factors to be considered are (1) whether inmates retain alternative means of exercising the circumscribed right, (2) the burden on prison resources that would be imposed by accommodating the right, and (3) whether there are alternatives to the regulation that fully accommodate the prisoners' rights at de minimis cost to valid penological interests."  <u>Jones</u>, 461 F.3d  at 360 (citations omitted).

Challengers of the regulation have the ultimate burden of persuasion that the policy is unreasonable and fails step one of the <u>Turner</u> analysis.  <u>Id</u>.  The defenders of the policy must provide a government interest that justifies the regulation and "demonstrate that the policy drafters could rationally have seen a connection between the policy and that interest."  <u>Id</u>.

> (2)   **Policy DC-ADM 803 passes the first step of the <u>Turner</u> analysis because it was promulgated in response to legitimate security concerns and is rationally related to the PA-DOC's interest in preventing contraband from entering the prisons.**

In <u>Jones</u>, the New Jersey Department of Corrections failed to meet its burden under the first step of the <u>Turner</u> analysis.  The government put forth a single justification for its restrictive policy: to reduce the risk of anthrax contamination in the prison.  The Third Circuit found that "there is no information suggesting a significant risk of an anthrax attack, there is no reasonable connection between those interests and the policy of opening legal mail in the absence of the inmate addressee."  <u>Id</u>. at 364.  This case differs from <u>Jones</u> in two significant respects.  First, unlike the New Jersey regulation, the Pennsylvania policy provides a procedure to allow legal mail to be opened in the

prisoner's presence.  Second, defendants have met their burden of demonstrating a rational relation between the policy and their penolological interest.

Policy DC-ADM 803 is valid under the first step of the <u>Turner</u> analysis, which requires a rational connection between the regulation and government interest that is not an "exaggerated response" to the policy objective.  461 F.3d  at 360.  Safety, security, and escape prevention are legitimate penological interests.  <u>Id</u>. at 364; <u>see</u> <u>also</u> <u>Guyer v. Beard</u>, 907 F.2d 1424, 1428-1429 (3d Cir. 1990) ("Preventing the introduction of contraband into the prison is unquestionably a legitimate penological interest.").  The New Jersey policy at issue in <u>Jones</u> failed because the Third Circuit found "no reasonable connection" between the penological interest and the regulation.  461 F.3d  at 364.  A reasonable connection is present in this case.

The PA DOC places great importance on mail inspection.  At SCI Graterford, mailroom processing facilities are located outside the secure perimeter away from the inmate population.  Although a few prisoners work in the mailroom as janitors, these workers complete their daily tasks in thirty minutes or less and are supervised.  Sending mail through an x-ray does not find all contraband.  Mail must also be opened and searched by mailroom employees.  If contraband is found, it can be more easily isolated in the mailroom, which also has a biohazard hood to safely open suspicious packages.  Mail is not read; employees open and flip through each piece of mail and reseal the correspondence after the search.

Traditionally, legal mail is exempted from mailroom examination and only inspected in the presence of the inmate.  Because of this policy, the PA DOC has documented over a decade of security breaches attributable to legal mail.  Thick legal documents provide ideal hiding places for contraband.  The testimony of Kimberly Ulisny and the Escape Report and Privileged Mail and Contraband Report document that legal mail has been used to smuggle contraband into Pennsylvania prisons.  The PA DOC cannot rely on a return address to verify that mail actually came from attorneys or courts because it is easy to forge or invent court envelopes or even documents.  There is no reason to expect that these practices will cease without a change in processing procedures for legal mail.

Defendants assert that "security and safety are best served when mail inspectors, whose job it is to inspect mail, inspect all of it in their own work areas, away from the prison housing and activity areas, out of the presence of the receiving inmate." Defs' Supp. Memo. p. 10.  Policy DC-ADM 803 limits the risk that legal mail will be used as a vehicle for contraband by limiting the class of material that is privileged and must be opened in the inmate's presence.

Unlike the New Jersey regulation, Policy DC-ADM 803 provides an alternative to ensure legal mail is opened in the inmates' presence.  Attorneys, or courts, can obtain a control number if they verify that they will not send contraband and will only use the control number for confidential legal communications.  Control number mail is treated as

privileged mail and opened in the prisoner's presence. This is done in two ways at Graterford. Prisoners in general population are permitted to receive their legal mail at the "control bubble" in the maintenance corridor. Here, a trained mailroom employee opens and searches the mail in the inmate's presence. When an inmate cannot leave his cellblock, mail delivery and inspection is left to the corrections officer on the cellblock. This is a less desirable procedure that must be limited for two reasons. First, the officer does not have the same inspection expertise as mailroom employees. And second, inspection on the cellblock poses additional security concerns not present when mail is inspected away from prisoners in the mailroom.

There is an additional safeguard for court mail sent without a control number. Even though the PA DOC does not consider this mail as privileged because court documents are public records,[11] it recognizes the value in quickly and efficiently delivering this mail to prisoners. Therefore, this mail is sorted and sent to cellblocks in a special green bag and corrections officers hand deliver the mail to inmates. This new procedure, effective after Plaintiffs' depositions, alleviates some of their timeliness concerns.

    **(3)    Policy DC-ADM 803 passes the second step of the <u>Turner</u> analysis because it allows for legal mail with a control number to be opened in**

---

[11] The Seventh and Ninth Circuits have ruled that mail from the courts is not confidential because these documents are available to the public. <u>Martin v. Brewer</u>, 830 F.2d 76, 78 (7th Cir. 1987) ("...with minute and irrelevant exceptions all correspondence from a court to a litigant is a public document, which prison personnel could if they want inspect in the court's files. It is therefore not apparent to us why it should be regarded as privileged..."), <u>Keenan v. Hall</u>, 83 F.3d 1083, 1094 (9th Cir. 1996).

**the inmates' presence and there are no other reasonable alternatives.**

Finding that the Pennsylvania policy passes the first step of the <u>Turner</u> analysis, the court must conduct the second part of the analysis and consider the other factors: (1) whether inmates have an alternative means of communication; (2) the prison's burden by accommodating the prisoner's right; and (3) any alternatives to fully accommodate the prisoners with a *de minimis* cost to the institution. <u>Jones</u>, 461 F.3d at 360. The policy also passes this step of the analysis.

As to the first factor, "[a]lternatives...need not be ideal, however; they need only be available." <u>Overton v. Bazzetta,</u> 539 U.S. 126, 135 (2003). Inmates do have an alternative method of establishing confidential communication with their attorneys. Attorneys can obtain a control number and use this number to mark communications that should only be opened in the presence of the inmates. Attorney are using these numbers. Courts can also obtain a control number. Further, defendants have not found any contraband in attorney control number mail, which suggests this policy is an effective means of preserving confidential attorney-client communications while eliminating contraband. The availability of control numbers helps to distinguish this case from the New Jersey policy at issue in <u>Jones</u>, which did not provide for this option.

The second <u>Turner</u> factor also favors the new policy. The Supreme Court requires deference to the judgment of prison administrators where "....the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards

and other prisoners alike...".  Thornburgh v. Abbott, 490 U.S. 401, 418 (1989); see also Overton, 539 U.S. at 135 (when accommodating prisoner's demands "would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls," courts should be "'particularly deferential' to prison administrators' regulatory judgments.").  Here, a return to the PA DOC's' prior policy of using the return address on an envelope to classify privileged mail and opening all mail that appears to be from a court or an attorney would perpetuate a security risk DC-ADM 803 is designed to remedy.  Additionally, plaintiffs advocate for a very broad definition of privileged legal mail, asserting the category should include legal newsletters and government forms.  Taking plaintiffs' view would impose an onerous administrative burden on the PA DOC.

The third Turner factor is actually a double-check on the first step of the analysis because "[t]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns."  Thornburgh v. Abbott, 490 U.S. 401, 418 (1989).  Policy DC-ADM 803 preserves confidential legal communications and ensures the prompt delivery of court mail while permitting most prison mail to be searched where it can be searched best: by trained mailroom employees away from inmate areas.  Plaintiffs request a return to the previous version of DC-ADM 803, that provided for logging of legal mail, because they allege that court mail can sit in

-26-

the mailroom for over a week or is delivered to the wrong cell.[12]  Plaintiffs' testimony

predated a change to DC-ADM 803 that requires court mail to be hand delivered to

inmates on their cellblock when it is received daily from the mailroom.  This change in

policy should alleviate plaintiffs' concern without imposing an additional administrative

burden.

**(B)    Right of Access to the Courts Claim**

Prisoners also have a constitutional right of access to the courts that is distinct

from their First Amendment right to freedom of speech.  Bieregu, 59 F.3d at 1453 (*citing*

Bounds v. Smith, 430 U.S. 817, 821 (1977)).  The source of this right is the First

Amendment right to petition clause and the guarantee of due process in the 5th and 14th

Amendments.[13]  Id. at 1453-54.[14]

Soon after the Third Circuit's decision in Bieregu, the Supreme Court added an

actual injury requirement to right to access court cases.  Oliver v. Fauver, 118 F.3d 175

(3d Cir. 1997).  The Court held that to pursue a claim of denial of access to the courts an

inmate must allege actual injury–that the prison's action "hindered his efforts to pursue a

---

[12] Plaintiffs did not allege any harm (e.g. a missed filing deadline) from the delayed delivery of legal mail. Additionally, the court notes that Beard testified that he was unaware of any systemic problems with untimely delivery of court and legal mail.

[13] In Bieregu, the 5th Amendment due process clause applied since defendants were federal officials.  In this case, the right would derive from the 14th Amendment, since plaintiffs challenge the policies of a state prison.

[14] The Third Circuit suggested that the Sixth Amendment could be a basis for this right as well, but was not applicable in Bieregu because the plaintiff's legal mail did not concern a criminal proceedings.  Like the plaintiff in Bieregu, the plaintiffs in this case do not have a Sixth Amendment right to counsel.  See Section III.C. *infra*.

legal claim." Lewis v. Casey, 518 U.S. 343, 351 (1996).  In Jones, the Third Circuit

affirmed this requirement for access to court claims.  461 at 359 n.6.

Plaintiff Robinson testified that he has never missed filing deadlines or been

adversely impacted by delayed legal mail.  Robinson Dep. pp. 71-72.  Plaintiff Ramirez

similarly has suffered no adverse impact.  Ramirez Dep. p. 42.  Accordingly, plaintiffs'

access to court claim under the First and Fourteenth Amendments fails because Policy

DC-ADM 803 has not hindered their efforts to pursue any legal claims

**(C)    Sixth Amendment Claim**

Plaintiffs cannot base a claim for relief on the Sixth Amendment, which only

guarantees a right to counsel in criminal proceedings.  Bieregu, 59 F.3d 1453-54.

Plaintiffs' criminal trials concluded long before they filed suit and plaintiffs have also

exhausted direct appeals.  The Sixth Amendment does not extent to habeas corpus

proceedings.  Id. at 1454 (citing Pennsylvania v. Finley, 481 U.S. 551, 555 (1987)).  Nor

does it apply to civil proceedings.  Policy DC-ADM 803 does not violate plaintiffs' Sixth

Amendment right.

**(D)    Immunity**

**(1)    The PA DOC and individual defendants sued in their official
capacity are entitled to Eleventh Amendment immunity from
plaintiffs' damages claims.**

In addition to injunctive and declaratory relief, plaintiffs also request monetary

damages.  This claim is barred by the Eleventh Amendment to the Constitution, which immunizes state and state agencies from suits by private parties.  Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997).  The PA DOC is an administrative branch of the Commonwealth of Pennsylvania and therefore, is immune to suit under the Eleventh Amendment.

Individual defendants are sued in their official capacities, because plaintiffs do not allege personal action by any of the individual defendants.[15]  Since state officials sued in their official capacity are the state, the Eleventh Amendment also immunizes the individual defendants for monetary damages although it does permit claims for injunctive relief.  Kentucky v. Graham, 473 U.S. 159, 166 (1985)

**(2)    Individual defendants are entitled to qualified immunity from plaintiffs' damages claims.**

The Third Circuit uses a two-part test to determine whether qualified immunity is available as a defense.  Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).  First, "the court must determine whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation."  Id.  If the plaintiff cannot show a constitutional violation, the analysis ends and the officer is granted immunity.  If, however, there is a constitutional violation, the court must determine whether the

---

[15] Plaintiffs claim that the individual defendants have been sued in their individual capacities.  Pls' Mot. Summ. J. ¶ 5.  However, plaintiffs' pleadings do not establish a basis for individual liability.  Moreover, even if plaintiffs have sued individual defendants in their individual capacities, the individual defendants are entitled to qualified immunity.  See Section III.D.(2) infra.

constitutional right was clearly established.  Id.  In other words, the court must determine "in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?"  Id.  The officer is entitled to qualified immunity only if "it would not have been clear to a reasonable officer what the law required under the facts alleged...."  Id. at 136-37.

Plaintiffs have not shown a violation of their constitutional rights.  Even if they had, individual defendants are entitled to qualified immunity.  The Third Circuit analyzed this identical issue in Jones and granted qualified immunity for two reasons.  First, the Third Circuit reasoned that "prison administrators in defendants' position would not have been violating inmates rights if they reasonably believed they were acting in the interests of inmate and staff health and safety."  461 F.3d at 364.  The record in this case also supports a finding that prison administrators were acting to preserve the safety of prisoners and staff through by regulating legal mail.  Second, the Third Circuit found that a reasonable administrator might have concluded that Bieregu, which held that prisoners have a First Amendment interest in being present while their legal mail is opened, was overruled after the court stated in  Oliver that Bieregu was no longer good law.  Id. at 364-65.  The Third Circuit found it reasonable that prison administrators would take this statement in Oliver at "face value."  Id. at 365.  This court will follow Jones and find that the individual defendants are entitled to qualified immunity from plaintiffs' damages claims.

**(E)     Policy DC-ADM 803 does not violate State Law**

Plaintiffs assert that Policy DC-ADM 803 violates state law and cite 37 PA. CODE § 93.2.  Plaintiffs may have referenced an older version of the regulation.  Robinson Dep. pp. 67-68.  The PA DOC's policy complies with the current version of this state law provision.

**IV.     CONCLUSION**

For the reasons stated above, I will grant defendants' motion for summary judgment and deny plaintiffs' motion.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS ROBINSON &** | : | **CIVIL ACTION** |
| **LUIS RAMIREZ,** | : | |
| **Plaintiffs,** | : | **NO. 03-05180** |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **CORRECTIONS, ET AL.,** | : | |
| **Defendants.** | : | |

**ORDER**

**AND NOW**, this 23rd day of January, 2007, upon consideration of Plaintiffs'

Motion for Summary Judgment (Document No. 9), Defendants' Motion for Summary

Judgment (Document No. 18), and the parties' supplemental filings and responses thereto,

it is hereby **ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED** and

Defendants' Motion are **GRANTED**.

_____The Clerk of the Court is directed to mark this case closed for statistical purposes.

BY THE COURT:

 /s/ Lawrence F. Stengel_____

LAWRENCE F. STENGEL, J.